**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE
4805 Mt. Hope Drive
Baltimore, MD 21215;

MI FAMILIA EN ACCIÓN
3030 N. Central Avenue, Suite 900
Phoenix, AZ 85012;

OCA–ASIAN PACIFIC AMERICAN ADVOCATES
1025 Connecticut Ave. NW, Suite 600
Washington, DC 20036;

NATIONAL URBAN LEAGUE
117 W 125th Street, 3rd Floor
New York, NY 10027;

MN8
550 Rice Street, 2nd Floor
Saint Paul, MN 55103;

SERVICE EMPLOYEES INTERNATIONAL UNION
1800 Massachusetts Ave. NW
Washington, DC 20036;

AMERICAN FEDERATION OF TEACHERS
555 New Jersey Ave. NW
Washington, DC 20001;

UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION
1775 K St. NW
Washington, DC 20006; and

INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES
7234 Parkway Dr.
Hanover, MD 21076,

*Plaintiffs*,

**Civil Action No. ___________**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

vs.

U.S. DEPARTMENT OF HOMELAND SECURITY
245 Murray Lane SW
Washington, DC 20528;

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security
245 Murray Lane SW
Washington, DC 20528;

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
500 12th Street SW
Washington, DC 20536;

DAVID VENTURELLA, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement
500 12th Street SW
Washington, DC 20536;

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave. NW
Washington, DC 20530;

TODD BLANCHE, in his official capacity as United States Attorney General
950 Pennsylvania Ave. NW
Washington, DC 20530;

FEDERAL BUREAU OF INVESTIGATION
935 Pennsylvania Ave. NW
Washington, DC 20535;

KASH PATEL, in his official capacity as Director of the Federal Bureau of Investigation
935 Pennsylvania Ave. NW
Washington, DC 20535; and

THOMAS HOMAN, in his official capacity as White House Executive Associate Director of Enforcement and Removal Operations

1600 Pennsylvania Ave. NW
Washington, DC 20500,

*Defendants*.

## INTRODUCTION

1. As the 2026 midterm elections begin, the federal government has claimed authority to station armed federal agents to unlawfully operate in the vicinity of voting locations. It has reversed longstanding departmental policies that prohibited armed federal immigration and law enforcement authorities from entering those locations. The Department of Homeland Security ("DHS"), Department of Justice ("DOJ"), and other federal government officials (collectively, "Defendants") have taken these actions while simultaneously conducting unprecedented law enforcement operations targeting communities of color in the lead-up to the election, including a sweeping national voter fraud investigation, an unusual voter surveillance operation targeting naturalized citizens, and months-long violent and intrusive immigration operations.

2. Federal law expressly prohibits sending armed federal agents to voting locations. Neither the Constitution nor federal law grants federal agencies any role in assessing or policing voter eligibility or regulating election administration in any way. Yet the Administration has repeatedly sought to interfere with election systems and announced its readiness to unlawfully deploy law enforcement to voting sites. Simultaneously, in at least one instance, DOJ conditioned the removal of immigration enforcement agents on state leaders turning over voter roll information.

3. The result is predictable: voters across the country—particularly Black, Latino, and Asian voters, naturalized citizens, and members of mixed-status families—are afraid to vote, help

others vote, and participate in civic life. This is unlawful voter intimidation squarely prohibited by Section 11(b) of the Voting Rights Act ("VRA").

4. Section 11(b) has long prohibited both actual and attempted intimidation, threats, and coercion of voters or anyone who assists or encourages voters. Tellingly, it does not require that such unlawful conduct ultimately prevent a voter from casting a ballot. Nor does it require voters to wait until they encounter threats on Election Day to assert their rights. Congress wrote the provision broadly on purpose: to protect the sacred right of voters to cast their ballots safely and without fear.

5. For nearly a century before the VRA was passed, Congress had observed how the mere threat of federal law enforcement presence could deter voters from engaging in the democratic process. Amid the Civil War, Congress passed legislation to expressly bar military or armed federal agents from places where elections are held because it was concerned about the abuse of executive power to influence elections. After the Civil War and through the Jim Crow era, armed officials and state-backed actors used threats of force to discourage and suppress political participation by groups traditionally denied access to the electoral process, such as Black, Latino, Asian, and naturalized immigrant voters. It is against this ignominious backdrop that Section 11(b) was enacted.

6. Over sixty years after the VRA was signed, Plaintiffs bring this case to enjoin Defendants' unlawful and undemocratic conduct, which harkens back to the very origins of Section 11(b). Rather than dispel concerns that federal law enforcement will take part in upcoming elections, the President and Defendants have done the opposite, repeatedly threatening to deploy federal law enforcement to the vicinity of voting locations during the November 2026 elections,

including statements just earlier this week from Director of the Federal Bureau of Investigation ("FBI") Kash Patel.

7. Defendants have sought to justify the deployment of federal law enforcement in elections through unsubstantiated claims of widespread noncitizen voting—a racist and xenophobic myth that has been repeatedly disproved. Defendants' conduct and rhetoric have caused, and will continue to cause, tremendous fear for those exercising their right to vote.

8. Per the federal government's own figures, convictions for non-U.S. citizens voting are so low as to be statistically insignificant. Nonetheless, Defendants are reportedly implementing an "Unlawful Voter Initiative," reassigning hundreds of immigration agents to use incomplete immigration data to pursue a nationwide hunt for noncitizen voters. In the process, Defendants are reportedly using flawed methodologies and faulty data that will almost certainly result in the surveillance, investigation, and even unlawful detention of U.S. citizens, particularly those from communities of color.

9. Defendants also have already wielded immigration enforcement in an attempt to extract election-related concessions prohibited by federal law. Although DHS[1] should have no connection to voters, in January 2026, during Operation Metro Surge in Minneapolis, a masked immigration agent shot to death an unarmed mother of three who was a U.S. citizen. Later that month, immigration agents shot to death another U.S. citizen in Minneapolis. These two killings were highly publicized and rightfully caused fear throughout the country, including among

[1] The primary mission of DHS, formed after the 9/11 Attacks, is articulated in 6 U.S.C. § 111. That mission includes "prevent[ing] terrorist attacks within the United States." 6 U.S.C. § 111(b)(1)(A). Nothing in that statement references monitoring elections or voter rolls. DHS's primary mission includes "ensur[ing] that the civil rights and civil liberties of persons are not diminished by efforts, activities, and programs aimed at securing the homeland." *Id.* § 111(b)(1)(G). Thus, the recent and contemplated actions that it has taken are directly at odds with its primary mission.

Plaintiffs' members. The Administration sought to capitalize on that terror, conditioning the withdrawal of its unprecedented federal deployment in Minnesota on the State's surrendering private voter roll data.

10. These threats have coincided with sweeping federal immigration enforcement operations that have targeted and terrorized communities with large Black, Latino, and Asian populations, and communities connected to immigrant populations.

11. Together, Defendants' threatening messaging and violent enforcement actions have created a climate in which voters, especially voters of color, are intimidated and fearful of engaging in the democratic process. Because of the Administration's intimidating actions and rhetoric, across the country, Plaintiffs' members and other voters credibly fear that their participation in this November's midterm elections will subject them to physical force and increased surveillance by the federal government.

12. Plaintiffs National Association for the Advancement of Colored People, Mi Familia en Acción, OCA–Asian Pacific American Advocates, National Urban League, MN8, Service Employees International Union, American Federation of Teachers, United Food and Commercial Workers International Union, and International Union of Painters and Allied Trades (collectively, "Plaintiffs") include and represent constituencies that include naturalized citizens, voters in mixed-status families, and Black, Latino, and Asian voters. Collectively, Plaintiffs represent millions of members and registered voters across all fifty states. They want to vote, encourage others to vote, and otherwise engage in the electoral process without fear that they may be unlawfully confronted by federal law enforcement agents. But Plaintiffs' members credibly fear they will be harassed, questioned, arrested, detained, or face physical violence from federal officials while they exercise the right to vote and encourage others to do the same. Many also fear that such encounters will

expose their loved ones to baseless immigration encounters, investigations, possible detention, and attempts to strip their citizenship.

13. Defendants' conduct has transformed voting and voting-related activities—ordinary acts of civic participation—into sources of anxiety, uncertainty, and fear. Defendants' conduct is chilling Plaintiffs' participation in the democratic process.

14. To prevent these ongoing harms, Plaintiffs seek a declaration that Defendants have engaged in conduct violating Section 11(b) of the VRA and an injunction barring Defendants from engaging in such unlawful intimidation and interference with the right to vote. This injunction is necessary to safeguard that foundational right in our democracy.

## PARTIES

***Plaintiffs***

15. Plaintiff National Association for the Advancement of Colored People ("NAACP") is the oldest and largest civil rights organization in the country. A nonprofit and nonpartisan organization, its mission is to achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the wellbeing, education, and economic security of Black people and all persons of color. The NAACP has been at the forefront of fighting against racial discrimination in voting and fighting for the rights of its members and those of all lawfully registered U.S. citizens to cast ballots and have those ballots counted.

16. The NAACP has approximately 200,000 members across every state in the nation and Washington, D.C., many of whom are registered voters. Consistent with its mission, the NAACP operates longstanding voter-registration, voter-assistance, mail-voting, and election-protection programs.

17. Its network of state conferences, local branches, college chapters, prison chapters, and youth councils conducts voter-registration drives, canvassing, voter contact, and election-protection work. The NAACP recruited more than 100,000 volunteers for that work before the 2024 election and launched a $20 million GOTV campaign to mobilize 6.5 million Black voters across fourteen states in 2026. Its staff and volunteers assist voters in registering, verifying their registration status, completing mail-ballot and emergency-ballot applications, and addressing barriers to voting.

18. Black voters, including those from communities the NAACP serves, have faced an extensive history of government intimidation, interference, and suppression. As a continuation of this history, Defendants' conduct is chilling the NAACP and its members from participating in the 2026 elections.

19. Plaintiff Mi Familia en Acción ("MFA") is a national, membership-based, 501(c)(3) nonprofit organization dedicated to building Latino power through community activation and civic engagement. MFA works to advance the health, safety, prosperity, and policy priorities of Latino communities by organizing, educating, and mobilizing Latino voters and community members to participate in civic and democratic life.

20. MFA conducts civic engagement in Arizona, Colorado, Florida, Georgia, Michigan, Nevada, North Carolina, Pennsylvania, Texas, and Wisconsin. MFA's civic engagement work includes offering voter registration services to eligible persons, encouraging voters to make a voting plan and cast their ballots, providing election protection assistance, sharing voter concerns with election officials, developing and supporting civic engagement leaders, and conducting voter education work through programs and public media.

21. MFA's members and constituents include eligible voters who are naturalized citizens, members of mixed-status households, and individuals with close ties to immigrant communities. Many of MFA's members are registered voters who regularly vote, participate in elections, and intend to do so in the 2026 midterm elections.

22. MFA also invests significant resources in developing community leaders and building long-term civic engagement capacity within Latino communities. Through trainings, workshops, and leadership development programs, MFA equips members to serve as trusted messengers and advocates within their communities. MFA members regularly help shape the organization's programming, outreach strategies, issue advocacy, and voter engagement efforts by identifying community priorities, providing feedback in debriefs with the organization, identifying guest speakers, developing talking points for MFA's issues, and advising and assisting with the development and implementation of civic engagement campaigns.

23. MFA's voter engagement and community organizing work depends on building trust within Latino communities, including immigrant communities and mixed-status families. MFA members regularly conduct outreach through canvassing, phone banking, door knocking, community events, voter registration drives, and other civic education efforts. Because MFA's members include naturalized citizens, members of mixed-status households, and individuals living in communities that have experienced immigration enforcement activity, they are particularly susceptible to fear, confusion, and intimidation arising from Defendants' actions.

24. Due to the fear and chilling effect caused by Defendants' actions, MFA's members' ability to fully carry out MFA's mission of building Latino civic and political participation has been impaired. That fear discourages MFA members and constituents from participating in

community events, engaging with voter outreach efforts, seeking election-related information, and exercising their right to vote.

25. Plaintiff OCA–Asian Pacific American Advocates ("OCA") is a national, membership-based, 501(c)(3) nonprofit organization dedicated to advancing the social, political, and economic well-being of Asian American, Native Hawaiian, and Pacific Islander communities. Founded in 1973, OCA works to promote civic engagement, voter participation, and equal access to democratic institutions through advocacy, leadership development, public education, and community organizing.

26. OCA is one of the nation's largest membership-based civil rights organizations and maintains a growing network of approximately thirty-five local and regional chapters across the United States. Through its chapters, members, and volunteers, OCA engages thousands of community members nationwide, including many eligible voters. Many of its members are registered voters who regularly vote, participate in elections, and intend to do so in the 2026 midterm elections. OCA's members and constituents include immigrants, naturalized citizens, members of mixed-status families, and individuals with close ties to immigrant communities.

27. OCA devotes substantial resources to voter education, voter engagement, and election participation efforts. Through its national office and network of local chapters, OCA members create and distribute multilingual voter guides and educational materials, conduct outreach to Asian American communities regarding voter registration and election participation, and provide language access support so that Asian American voters, including voters with limited English proficiency and older voters, are able to participate fully in the electoral process. OCA also works to protect and expand political participation among Asian American communities by advocating for language access and other measures that reduce barriers to voting.

28. OCA members also regularly engage eligible voters through voter registration efforts and civic engagement activities. This work includes assisting newly naturalized citizens with voter registration and civic participation and helping ensure that new citizens can take part in the democratic process. OCA's voter engagement efforts are particularly focused on reaching immigrant voters, voters with limited English proficiency, and first-time voters who may otherwise face obstacles to participating in elections.

29. OCA's civic engagement programs rely on building trust within immigrant and Asian American communities and encouraging community members to engage in public life without fear. OCA's staff, members, and volunteers regularly conduct outreach in neighborhoods and communities with significant immigrant populations, educate voters about their rights, and assist eligible voters with accessing election-related information and resources.

30. Defendants' actions create fear and uncertainty among OCA's members and the communities OCA serves, discouraging individuals from attending community events, engaging with civic participation programs, and exercising their right to vote.

31. Plaintiff National Urban League ("NUL") is a 501(c)(3) nonprofit corporation headquartered in New York, New York. It is the largest historic civil rights and urban advocacy organization committed to elevating the standard of living for Black Americans, other historically underserved people, and urban communities through economic empowerment. Founded in 1910, NUL is one of the oldest civil rights organizations in existence.

32. NUL has ninety-three local affiliates (known as the affiliate movement) in 300 communities across thirty-seven states and the District of Columbia that offer various direct services and advocacy to enhance the lives of more than 3.8 million people nationwide, many of whom are registered voters. Dedicated to economic empowerment, NUL provides programming

and advocacy around education and youth development, job training and workforce development, housing counseling, entrepreneurship, health equity, and overall quality of life. Individuals can participate in Urban League programs and activities by connecting with a local NUL affiliate.

33. Through its Equitable Justice and Strategic Initiatives ("EJSI") Division, NUL empowers affiliates and communities by supporting them in advocating for equitable justice through policy guidance, research, coalition-building, and convening conversations.

34. The EJSI Division's work includes devoting significant resources to civic engagement and democracy. Because the right to vote is sacred and is under attack, NUL serves as a leading voice in advocating for the protection of the right to vote for all Americans, regardless of race, gender, religion, or zip code. NUL's programs advocate for stronger protections and use a coordinated approach to registering and educating voters nationwide. These programs include Reclaim Your Vote, through which NUL responds to the fact that one in five Black Americans have experienced a barrier when attempting to cast their ballot by offering a "Take Action" application, which allows voters to check their registration status, sign up to volunteer, and locate their polling place.

35. In 2026, as part of the Demand Diversity Roundtable, NUL released "America 250: A Guide for Defending Democracy," a guide serving as a nonpartisan civic education tool for participating in democracy. This guide provides questions for individuals and voters to ask public officials at candidate forums, town halls, and community meetings, including how candidates intend to protect core civil rights and the right to vote; how candidates plan to reject racism, discrimination, and dehumanization; what candidates will do to strengthen democracy and public trust; and how candidates plan to serve all Americans, regardless of race or economic status.

36. NUL's expansive programming centered on promoting political participation aims to ensure that all eligible voters, including future voters and incarcerated voters, may freely and fairly exercise their right to vote.

37. Because of the extensive history of suppression of Black voters, including violent voter intimidation and interference, NUL's members find the prospect of federal law enforcement at the polls particularly intimidating. As a result, Defendants' conduct is chilling NUL members' ability to exercise their right to vote.

38. Plaintiff MN8 is a Minnesota-based 501(c)(3) nonprofit organization that serves Southeast Asian individuals and families impacted by immigration enforcement, detention, and deportation. Founded in 2016 in response to the widely publicized detention and threatened deportation of eight Cambodian Minnesotans, MN8 has grown from a local campaign into a recognized advocate for issues facing Southeast Asian refugees, immigrants, and their families. MN8's story and work captures the full arc of immigrant life in America: from fighting deportation and family separation to helping communities build civic power and participate fully in democracy.

39. MN8 maintains members and constituents throughout Minnesota, including registered voters and eligible voters who intend to participate in upcoming elections. MN8's members and constituents include immigrants, refugees, naturalized citizens, members of mixed-status families, and individuals with close ties to communities that have experienced immigration enforcement activity. Through its organizing and advocacy, MN8 serves as a trusted voter education resource on immigration and civic engagement issues for Southeast Asian communities.

40. Civic engagement is a central component of MN8's work. MN8 develops voter education, community forums, phone banking, and election turnout efforts. MN8 has organized

intergenerational, language-based forums to educate elders and community members about candidates and issues.

41. MN8 has observed that fear of immigration enforcement and government surveillance discourages community members from engaging in civic life, including voting, voter education, and participation in public discourse. Though MN8's U.S. citizen members would typically be involved in election-related activities, many are afraid of encountering physical violence, surveillance, and immigration enforcement actions if they vote or otherwise participate in the 2026 election.

42. Plaintiff Service Employees International Union ("SEIU") is a 501(c)(5) nonprofit labor organization headquartered in Washington, D.C. SEIU was founded in 1921 by immigrant janitors from Eastern Europe, Africa, Turkey, Spain, and Ireland. Its members are united by their shared belief in the dignity and worth of workers and the services they provide and are dedicated to improving the lives of workers and their families and creating a more just and humane society. This fight includes protecting workers' fundamental right to vote.

43. SEIU has approximately two million members, with more than 150 affiliates across the United States, Canada, and Puerto Rico. SEIU members work in healthcare, the public sector, and property services, including as nurses, doctors, homecare providers, hospital and nursing home workers, educators, janitors, security officers, airport workers, and local, state, and federal workers. SEIU members are members of both their local union affiliate and SEIU.

44. SEIU's membership is broadly diverse, with caucuses including Latino, Black, and Asian Pacific Islander members. SEIU members also include eligible registered voters who intend to vote in the 2026 midterm elections. SEIU members include immigrants, naturalized citizens, members of mixed-status families, and individuals with close ties to immigrant communities.

SEIU members also include individuals who assist their family members with voting and encourage others in their communities to do the same.

45. SEIU is dedicated to encouraging its eligible members, their families, and other individuals to exercise their right to vote. SEIU seeks to maximize voter participation in local, state, and national elections, with a particular focus on communities that have lower turnout rates. Every election cycle, SEIU members and organizers engage in door-to-door canvassing, phone banking, issue education, and election protection operations to reach other union members and voters in their communities, allowing them to discuss issues that are important to these voters and encourage them to make a plan to vote in the upcoming election.

46. In addition, many SEIU affiliates host "Democracy Schools" to educate members on how our government works and ways they can engage in the political process. SEIU and its local union affiliates—through civic engagement, organizing, litigation, and legislative advocacy—have also worked to expand voter participation in elections, stop discriminatory voter purges, ensure legally cast ballots are counted, and enact stronger protections against voter suppression and vote dilution.

47. SEIU members across the country have changed how they live and work over the last year because of immigration enforcement operations. Some members, including U.S.-born citizens, have been stopped, interrogated, and in some cases held by federal agents. Many members now think twice before stepping outside. This is especially true among SEIU's Latino members and members who work or live in communities with large Latino populations. Having personally known or seen U.S. citizens and residents with lawful status detained just because of their appearance or because they speak Spanish, these members believe that no one in their neighborhoods is safe. This has also been the lived experience of other SEIU members with

immigrant backgrounds from Asian, African, or Middle Eastern countries, or who live in communities with significant immigrant populations.

48. Plaintiff American Federation of Teachers ("AFT") is a 501(c)(5) nonprofit membership organization founded in 1916 and headquartered in Washington, D.C. AFT's mission is to promote fairness, democracy, economic opportunity, and high-quality public education, health, and public services for students, families, and communities.

49. AFT is one of the nation's largest unions, with more than 1.8 million members in more than 3,000 local affiliates across all fifty states. Its membership comprises early childhood educators, pre-K-through-12th grade teachers, paraprofessionals and other school-related personnel, higher education faculty and professional staff, government employees, and healthcare professionals. Many AFT members are registered voters who regularly vote and volunteer to assist voters during elections, and intend to do so in the 2026 midterm elections.

50. AFT's membership comprises many Black, Latino, and Asian workers, including immigrants, naturalized citizens, and members of mixed-status families. AFT supports several affinity-based task forces, including a Latino Issues Task Force, Asian American and Pacific Islander Task Force, Native American Indigenous Task Force, and Racial Equity Task Force, which focuses on Black members.

51. AFT devotes substantial resources to voter education, voter engagement, and election protection efforts. For the 2026 elections, AFT's "Count Me In!" program is recruiting and training members to encourage their colleagues, families, and neighbors to vote. AFT's Democracy Defenders program recruits and trains members to assist with election protection efforts to ensure every eligible voter can cast a ballot and have it counted.

52. Many AFT members work closely with students, patients, and families who live in immigrant communities and mixed-status households. AFT members' professional success relies on building trust and open communication with the students, families, and patients they serve. For educators, this trust allows students to attain educational success and engage in public life without fear. For healthcare members, it allows patients to seek necessary care without fear. This trust is essential to AFT's mission of promoting high-quality public education and health.

53. Many of AFT's members live, work, and vote in communities where immigration agents have been active. AFT members report that fear of encountering immigration agents has caused many of their students, patients, colleagues, and neighbors to avoid going to school, the hospital, work, the grocery store, or even on walks in their neighborhoods. AFT members have also reported fear of going to work themselves due to the heightened presence of immigration enforcement in or near schools and hospitals.

54. As a result of Defendants' conduct, AFT members are chilled from participating in AFT's voter mobilization and election protection programs or otherwise engaging in the 2026 elections.

55. Plaintiff United Food and Commercial Workers International Union ("UFCW") is a nonprofit membership organization headquartered in Washington, D.C. It represents approximately 1.2 million members across the United States and Canada. The UFCW name dates to 1979, although the roots of its predecessor unions stretch back to the late 19th century.

56. UFCW represents workers in grocery and retail stores, pharmacies, healthcare and manufacturing facilities, food processing and meat packing plants, and other industries. Members live in rural and urban parts of the country. They are on the front lines of society, working hard to feed, serve, and strengthen neighborhoods and communities.

57. UFCW's membership includes many Black, Latino, and Asian individuals. In addition, its members include immigrants, naturalized citizens, and members of mixed-status families. UFCW's naturalized and first-generation citizen members can be found in nearly every state of the Union. Many UFCW members are registered voters who regularly vote, participate in elections, and intend to do so in the 2026 midterm elections.

58. UFCW's mission is to fight for members' rights by advocating for better wages and benefits, secure retirement, high-quality health insurance, paid vacation, holidays, and sick leave, dependable scheduling, overtime protection, and other benefits. To that end, UFCW helps members negotiate strong contracts, represents individual members, acts as watchdogs, and helps build solidarity among food and commercial workers.

59. Protecting the right to vote for all eligible members is core to UFCW's mission. UFCW defends the voting rights of all eligible members by actively working to ensure that members have equal access to the democratic process and accurate information on how to vote.

60. UFCW shares election information and educates members on the voting process through a program called UFCW Votes. The program links members to information sources that allow them to check their registration, register to vote, request mail-in ballots, and set election reminders.

61. Many UFCW members live, work, and vote in communities in which federal immigration agents have been active. Members have reported that fear of encountering immigration agents has caused them and many of their colleagues to fear daily activities, including going to work, school, or the grocery store. Defendants' elections-related rhetoric and conduct have amplified these fears, causing UFCW members to be intimidated from voting or otherwise participating in the 2026 elections.

62. Plaintiff International Union of Painters and Allied Trades ("IUPAT") is a 501(c)(5) nonprofit labor organization headquartered in Hanover, Maryland, advocating for over 100,000 members in every U.S. state and throughout Canada.

63. IUPAT is more than 130 years old, founded in the 19th century and organized formally in 1887. Since its founding, IUPAT has fought for fair compensation and safe conditions in the trades it represents and strived to create a community dedicated to advancing the rights of working people.

64. IUPAT represents dozens of trades. Its membership is comprised of industrial painters, commercial and decorative painters, drywall finishers, glaziers and glass workers, sign and display workers, trade show workers, floor covering installers, and many other private sector industries, as well as workers in the public sector. Many IUPAT members are registered voters who regularly vote, participate in elections, and intend to do so in the 2026 midterm elections.

65. IUPAT's mission is to forge strength through unity by working together across North America regardless of individual trades, supporting and respecting members and their families on and off the job, and fighting collectively for stronger contracts, safer job sites, industry-leading pay, and higher standards for all craft workers.

66. Protecting the right to vote for all members is central to IUPAT's mission. IUPAT defends the voting rights of all members by actively working to ensure that members have equal access to the democratic process and accurate information on electoral issues and candidates for office that support its mission.

67. Many IUPAT members live, work, and vote in communities where federal immigration agents have been active. They have reported that fear of encountering immigration agents has caused them to avoid going to work, school, or other public places.

68. As a result of Defendants' conduct, IUPAT members are chilled from participating in the organization's voter mobilization and election protection programs or otherwise engaging in the 2026 elections.

***Defendants***

69. Defendant U.S. Department of Homeland Security ("DHS") is a Cabinet-level department in the federal government headquartered in Washington, D.C. Its component agencies include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE") that includes Homeland Security Investigations ("HSI"), U.S. Customs and Border Protection ("CBP") that oversees the U.S. Border Patrol, and the Federal Protective Services ("FPS").

70. Defendant Markwayne Mullin is the Secretary of Homeland Security. He is sued in his official capacity.

71. Defendant ICE is a federal enforcement agency housed under Defendant DHS and headquartered in Washington, D.C.

72. Defendant David Venturella is the acting director of ICE and is sued in his official capacity.

73. Defendant U.S. Department of Justice ("DOJ") is a Cabinet-level department in the federal government headquartered in Washington, D.C. Its component agencies include the Federal Bureau of Investigation ("FBI"), the Bureau of Prisons, and the U.S. Marshals Service.

74. Defendant Todd Blanche is the United States Attorney General and head of the DOJ. He is sued in his official capacity.

75. Defendant Federal Bureau of Investigation is a component agency of the DOJ.

76. Defendant Kash Patel is the Director of the FBI. He is sued in his official capacity.

77. Defendant Thomas Homan is the White House Executive Associate Director of Enforcement and Removal Operations. He is sued in his official capacity.

## VENUE AND JURISDICTION

78. This Court has jurisdiction under 28 U.S.C. § 1331 and § 1343 because this action involves federal questions under the Voting Rights Act of 1965.

79. Venue is proper under 28 U.S.C. § 1391(b) and (e) because each Defendant is an agency of the United States or an officer or employee of the United States or any agency thereof acting and sued in their official capacity, at least one Defendant resides in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTS

### A. Deploying Law Enforcement to Intimidate Voters Is a Longstanding and Well-Documented Tactic of Racialized Voter Intimidation.

80. The threat and actual deployment of law enforcement were a widespread and often violent form of racialized voter intimidation used to deter and disenfranchise Black voters who had gained the right to vote through the passage of the Reconstruction Amendments following the Civil War.

81. As part of a long history of efforts to intimidate Black voters before the passage of the Voting Rights Act, police officers notoriously shut down voter registration efforts in widespread fashion across Southern jurisdictions.

82. In 1963, hundreds of Black residents of Selma, Alabama, were met by law enforcement officers who used intimidation tactics to prevent them from registering to vote. Hundreds of Black residents were arrested, beaten, or threatened while waiting in line to register. They were not allowed to leave the line to eat, drink, or use the restroom. The officers also harassed and attacked supporters attempting to provide food and water to those waiting to register.

83. Two years later, law enforcement's intimidation and violent attacks of Black citizens defending their voting rights during the Selma-to-Montgomery March were the actions that led to the passage of the Voting Rights Act of 1965.

84. Acknowledging the impact of almost a century of racialized voter intimidation, Congress passed the Voting Rights Act and included Section 11(b) to ensure all eligible voters could register to vote, encourage others to register to vote, and exercise the franchise free of violent threats or subtler forms of pressure, including abuse of legal processes.

85. The voter suppression tactics that led Congress to enact the Voting Rights Act are re-emerging in a modern form, this time by the federal government and targeting a broader set of voters. Just as earlier generations of voters faced intimidation through threatened use of official powers, Plaintiffs today confront a climate in which armed law enforcement, allegations of widespread voter fraud, denaturalization efforts, and the rhetorical scapegoating of communities of color have created reasonable fears of participating in democracy and substantial burdens on the right to vote.

### B. Defendants Use Racialized and False Allegations to Attempt to Tie Voter Fraud to Communities of Color.

86. Today, Defendants are sustaining this modern form of racialized voter intimidation by framing political participation by communities of color as inherently nefarious and illegitimate.

87. For years, including during his first term, President Donald J. Trump has used racialized language to link unfounded claims of voter fraud to cities with large Black, Latino, and immigrant populations.

88. After President Trump lost the 2020 presidential election, he refused to accept the election results and claimed that there was voter fraud in cities with large Black and Latino populations. For example, on November 30, 2020, he tweeted, "We have some big things

happening in our various litigations on the Election Hoax. Everybody knows it was Rigged. . . . Look what happened in Detroit, Philadelphia, plus!"[2]

89. He continued making racially coded claims before the 2024 election, at one point asserting, "Our elections are bad, and a lot of these illegal immigrants coming in, they're trying to get them to vote . . . . They can't even speak English. They don't even know what country they're in practically."[3]

90. Since returning to office in 2025, President Trump has repeatedly and falsely asserted that noncitizens are voting in significant numbers and used those claims to call for increased federal involvement in election administration.

91. President Trump publicly called on members of Congress to "nationalize" elections, stating: "These people were brought to our country to vote, and they vote illegally."[4] Plaintiffs also understand President Trump's remarks as calling for federal personnel to intervene in elections, and his use of the phrase "these people" to refer to predominantly Black, Latino, Asian, and immigrant communities, as President Trump has repeatedly and persistently used that

[2] *Donald J. Trump (1st Term): Tweets of November 30, 2020*, Am. Presidency Project, https://www.presidency.ucsb.edu/documents/tweets-november-30-2020 (last visited Sep. 17, 2026).

[3] Marshall Cohen & Daniel Dale, *Fact Check: 12 Election Lies Trump Is Using to Set the Stage to Dispute a Potential 2024 Defeat*, CNN (Sep. 30, 2024), https://www.cnn.com/2024/09/30/politics/fact-check-trump-election-lies-2024/index.html.

[4] Reid J. Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. Times (Feb. 2, 2026), https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html; Miles Parks, Transcript: *Trump Says He Wants Republicans to 'Nationalize' Elections*, NPR: All Things Considered (Feb. 3, 2026), https://www.npr.org/2026/02/03/nx-s1-5698095/trump-says-he-wants-republicans-to-nationalize-elections.

phrase alongside dehumanizing language, such as referring to people as "animals," to deride racialized groups.[5]

92. During his 2026 State of the Union address, President Trump told Congress and the American people that "cheating is rampant in our elections" and "[a]ll voters must show proof of citizenship in order to vote."[6]

93. In a prime-time address to the nation on July 16, 2026, President Trump again repeated false claims of widespread noncitizen voting, claiming that DHS had identified "approximately 278,000 non-citizens who are registered to vote in federal elections" and that "the real number [was] actually much higher than that" because "Democrat states refuse to share their voter files." He also claimed that "[h]undreds of thousands of noncitizens and dead people are listed and active on the voter rolls."[7]

94. DHS officials have echoed President Trump's false and racialized claims.

95. In February 2026, then-Secretary of Homeland Security Kristi Noem stated that anyone who opposed a documentary proof of citizenship requirement "want[s] to cheat . . . . They want illegal people and aliens in this country to be able to vote for them and to rob the United States citizens of their vote."[8] Such a requirement calls to mind historical efforts, dating from the

[5] Stephanie L. Canizales & Jody Agius Vallejo, *Latinos & Racism in the Trump Era*, Am. Acad. Arts & Scis: Dædalus (Spring 2021), https://www.amacad.org/publication/daedalus/latinos-racism-trump-era.

[6] *TRANSCRIPT: President Trump Delivers the State of the Union Address, 2.24.26*, Senate Democrats (Feb. 24, 2026), https://www.democrats.senate.gov/newsroom/trump-transcripts/transcript-president-trump-delivers-the-state-of-the-union-address-22426.

[7] Zachary B. Wolf & Annette Choi, *Trump's Speech Claiming US Election Vulnerabilities, Annotated*, CNN (July 17, 2026), https://www.cnn.com/interactive/2026/07/politics/annotated-transcript-trump-speech-us-election-vis/.

[8] Louis Casiano, *Noem Backs SAVE America Act, Slams 'Radical Left' Opposition to Voter IDs and Proof of Citizenship*, Fox News (Feb. 13, 2026), https://www.foxnews.com/politics/noem-backs-save-america-act-slams-radical-left-opposition-voter-ids-proof-citizenship.

Jim Crow era and extending to the present, to impose stringent voter registration requirements in order to suppress the votes of Black, Latino, Asian, and immigrant voters.

96. On July 17, 2026, the day after President Trump's prime-time address on elections, Defendant Mullin repeated the President's claim that DHS had identified "250,000 noncitizens registered to vote" in four states, even though he reportedly acknowledged in a letter he sent to local election officials in one of those states that DHS's estimates were "preliminary."

97. Federal officials' repeated false assertions that immigrants threaten the validity of American elections ignore substantial evidence that such occurrences are exceedingly rare. In 2026, after Utah completed a review of its approximately 2.1 million registered voters, it announced that it had found *zero* occurrences of noncitizen voting. Last year, Louisiana reviewed its voter records going back four decades and identified only 79 potential noncitizens who voted, out of an estimated 74 million ballots cast during that period. Louisiana's Secretary of State declared that "noncitizens illegally registering or voting is not a systemic problem in Louisiana."[9] Past investigations by states, researchers, and media outlets have similarly underscored that noncitizen voting is not a significant occurrence.

98. For its part, DHS has falsely represented the results of noncitizen voter investigations to date. For example, DHS said it identified 15,903 noncitizens on Nevada's voter rolls but later acknowledged in a meeting with state election officials that it had reviewed only a fraction of the cases, and of those, barely 1.1% were "confirmed" noncitizens.[10] By perpetuating

---

[9] Louisiana Secretary of State, Facebook (Sep. 4, 2025), https://www.facebook.com/Louisianasos/posts/secretary-of-state-nancy-landry-announced-the-preliminary-results-of-an-ongoing-/1271219118366334/.

[10] Gabe Cohen, *Trump Officials Touted a Voter Fraud Bombshell. Their Data Hasn't Proved It*, CNN (Aug. 21, 2026), https://www.cnn.com/2026/08/21/politics/markwayne-mullin-voter-fraud-nevada.

lies about noncitizen voting, Defendants are laying the groundwork to legitimize their intimidating federal enforcement operations.

**C. Defendants Have Repeatedly Indicated a Willingness to Use Federal Agents in the Vicinity of Voting Locations.**

99. Defendants' and other federal government officials' statements casting voters of color as fraudulent go hand in hand with Defendants' escalating rhetoric about using federal law enforcement during the 2026 elections.

100. Although federal law prohibits such deployment under 18 U.S.C. § 592, Defendants have repeatedly raised the prospect of deploying DHS agents or other federal personnel in the vicinity of voting locations. Several officials have stated that federal agents could be present in the vicinity of voting locations during the 2026 midterm elections while refusing to identify any meaningful limits on that authority.

101. On January 20, 2025, the Administration rescinded a prior policy limiting immigration arrests in protected areas that often double as polling places, including schools, churches, and social services buildings. Some version of a protected area policy had been in effect since 1993.

102. President Trump has also indicated a willingness to use federal forces to interfere with elections. For example, he said he regretted not ordering federalized National Guard troops to seize voting machines in certain states after the 2020 general elections. He warned that, if he concludes the 2026 midterm election results are not "honest," then "something else has to happen."[11]

[11] Alan Feuer, *Trump Regrets Not Seizing Voting Machines After 2020 Election*, N.Y. Times (Jan. 11, 2026) https://www.nytimes.com/2026/01/11/us/trump-voting-machines-2020-election.html; Ebony Davis, *Trump suggests federal control of elections in 'some areas,'* MS Now (Feb. 5, 2026), https://www.ms.now/news/trump-suggests-federal-control-of-elections-in-some-areas.

103. In February 2026, White House Press Secretary Karoline Leavitt stated that the Administration could not guarantee that ICE agents would not be present at polls during the midterm elections.

104. When asked this summer whether he would send National Guard troops or DHS agents to voting locations during the 2026 general elections, the President stated, "I'd do anything necessary to make sure we have honest elections."[12]

105. Public reporting indicates that senior DHS and DOJ appointees have held a series of meetings to discuss deploying law enforcement personnel in the vicinity of voting locations to "secure" the 2026 midterm elections.[13]

106. Defendant Mullin has repeatedly declined to rule out deploying DHS agents in the vicinity of voting locations. At his confirmation hearing in March 2026, he said agents could be sent in response to a "specific threat" without explaining what would qualify.[14]

107. Contemporaneously, Defendant Homan stated that "part of DHS's job is [to] secure elections," but that he was "not going to say . . . what our plan is going forward."[15]

---

[12] Video posted by PBS News (@NewsHour), X (May 12, 2026), https://x.com/NewsHour/status/2054282657228279891?s=20.

[13] Carol Leonnig, Laura Barrón-López & Vaughn Hillyard, *White House Directing DHS to Hunt for Voter Fraud by Naturalized Citizens: Sources*, MS NOW (Feb. 18, 2026), https://www.ms.now/news/memo-shows-white-house-directing-dhs-to-hunt-for-voter-fraud-by-naturalized-citizens.

[14] Ximena Bustillo, *Sen. Paul Confronts Sen. Mullin over Violent Rhetoric at His DHS Confirmation Hearing*, NPR (Mar. 19, 2026), https://www.npr.org/2026/03/18/nx-s1-5749360/markwayne-mullin-dhs-confirmation-hearing.

[15] Rebecca Beitsch, *Homan on Democrats Opposing ICE at Voting Sites: 'What Are They Afraid of?'*, The Hill (Mar. 25, 2026), https://thehill.com/homenews/campaign/5800012-homan-ice-polling-places/.

108. Months later, Defendant Mullin stated that the President had directed DHS to "secure our elections," that DHS would be "proactively looking at early voting," and that there was "no daylight" between the President and DHS enforcement operations.[16]

109. Defendant Blanche has suggested that DHS's armed officers could be deployed in connection with election-related operations, including at voting locations. In defense of federal law enforcement at voting locations, he stated, "Why wouldn't everybody in Washington, everybody in the United States be supportive of" federal forces at voting locations "to make sure that people who are here illegally are not voting?" He then reiterated, "we will do everything that we can to keep people from voting who shouldn't vote."[17]

110. On August 31, 2026, Defendant Mullin asserted that ICE officers could be deployed in the vicinity of voting locations if DHS deems "there is a threat to that polling place," and that ICE officers could be in the vicinity of voting locations "[i]f we're serving a warrant on someone," adding, "we will be where we need to be."[18]

111. Defendant Mullin made those statements the same day public reporting revealed that DHS plans to expand its efforts to investigate voter fraud by "surg[ing]" agents in at least nine states.[19]

---

[16] DHS, *Secretary Mullin Delivers Remarks on President Trump's Update on Election Integrity Efforts*, at 9:06–9:20, 12:05–12:15, 22:35–22:46 (YouTube, streamed July 17, 2026), https://www.youtube.com/watch?v=jjuVaRAEpe4.

[17] Video posted by News Nation (@NewsNation), YouTube Shorts, *Will ICE be at election polling locations?* (May 6, 2026), https://www.youtube.com/shorts/NL-pU5sQYvk.

[18] Associated Press, *WATCH: DHS Secretary Mullin Says Thousands Arrested in New York Immigration Operation*, PBS News (Sep. 1, 2026), https://www.pbs.org/newshour/politics/watch-dhs-secretary-mullin-says-thousands-arrested-in-new-york-immigration-operation.

[19] Nick Corasaniti & Hamed Aleaziz, *Trump Administration Begins Blitz to Find Elusive Voter Fraud Ahead of Midterms*, N.Y. Times (Sep. 2, 2026), https://www.nytimes.com/2026/09/02/us/politics/trump-election-voter-fraud.html; Priscilla Alvarez, Tierney Sneed & Gabe Cohen, *Exclusive: DHS Plans to Launch Voter Fraud Investigation Surge Tuesday*, CNN (Aug. 31, 2026), https://www.cnn.com/2026/08/31/politics/homeland-security-voter-fraud-investigations.

112. On September 13, 2026, when asked whether the government has affirmatively ordered federal agents to stay away from voting locations in response to voters' fears that such deployments could occur, Defendant Homan stated, "Look, there is no sensitive location policy. There is no sanctuary for a significant public safety threat or national security threat. We'll go where we've got to go to apprehend these people."[20]

113. During a hearing before the Senate on September 15, 2026, when questioned about whether the FBI would comply with any demands by President Trump to interfere with the elections, Defendant Patel declined to rule out that FBI agents could be sent to the polls on Election Day and instead said that "[i]f there's a reason to go there" on the basis of "a violation" then "we will."[21]

**D. DHS Has Directed Immigration Agents to Target U.S. Citizens of Color Whom They Profile as Noncitizen Voters.**

114. As Defendants assert their authority to send federal agents to the vicinity of voting locations, DHS has reportedly reassigned hundreds of Homeland Security Investigations and U.S. Citizenship and Immigration Services personnel and adopted new internal directives to ramp up elections-related investigations. Congress did not create DHS to oversee elections or determine who is eligible to vote.

115. Defendants are reportedly calling USCIS and HSI's amplified investigative effort the "Unlawful Voter Initiative."

116. HSI is a sub-component of ICE and the "principal investigative component of DHS." Its stated mission is to investigate and prosecute transnational criminal and terrorist

[20] *Tom Homan Reacts to Denver Lawsuit Seeking to Block ICE at Polls*, at 3:21–3:31, Fox News: Sunday Briefing (Sep. 13, 2026), https://www.foxnews.com/video/6405008680112.

[21] Rebecca Beitsch, *Senate Democrats Press Patel on Elections, Journalist Subpoenas: 5 Takeaways*, The Hill (Sep. 15, 2026), https://thehill.com/homenews/senate/6091335-fbi-kash-patel-senate-judiciary-takeaways/.

activities. However, HSI frequently involves itself in immigration enforcement activity. Under the current Administration, there have been numerous public reports of HSI personnel in tactical, military-style gear joining civil immigration enforcement operations.

117. On August 31, 2026, *CNN* reported that an internal DHS guidance document directs HSI to expand elections-related investigations in at least nine states—California, Connecticut, Georgia, Missouri, Nevada, New York, Pennsylvania, Washington, and Wisconsin—between early September and mid-October 2026.[22] In some of these states, early in-person voting will be underway during the stated investigations period.

118. Further reporting suggests that DHS has reassigned USCIS officials from their normal immigration and naturalization-related duties to instead focus on identifying "potential unlawful voter[s]" by cross-referencing data the Administration has gathered on voters in all fifty states, including from publicly available voter rolls, against DHS's citizenship and immigration status databases.[23]

119. On September 14, 2026, a USCIS whistleblower disclosure revealed that DHS officials know the source data they instructed agents to use contain inaccuracies. Officials stated that they would use what they called "supplemental magic" to add A-numbers, unique identifiers that USCIS assigns to noncitizens, to the voter data collected by the agency. Officials acknowledged that "in some instances you'll see people have multiple A-numbers," indicating "an error in the data," but nevertheless insisted that agents continue using the data to refer individuals for investigation.

---

[22] Priscilla Alvarez et al., *Exclusive: DHS Plans to Launch Voter Fraud Investigation Surge Tuesday*, CNN (Aug. 31, 2026), https://www.cnn.com/2026/08/31/politics/homeland-security-voter-fraud-investigations.
[23] Corasaniti & Aleaziz, *supra* note 19.

120. According to the disclosure, DHS officials knew that flaws in the data created a substantial risk that many U.S. citizens would be wrongfully flagged for investigation. Despite this risk, officials were instructed to flag the individuals even when the agents believed the data to be unreliable. This instruction effectively prioritized investigative referrals over data accuracy, despite the known risk of misidentifying U.S. citizens.

121. USCIS officials are reportedly referring cases to HSI agents, who then "pursue investigative leads, conduct field interviews, and support timely prosecutorial review."

122. Given reports that HSI has deployed tactical, militarized response teams during recent civil immigration enforcement operations and evidence that DHS's underlying data may wrongly identify U.S. citizens as potential unlawful voters, Plaintiffs fear that Defendants' implementation of the "Unlawful Voter Initiative" will subject U.S. citizens and their communities to unwarranted investigations or encounters with heavily armed federal agents during the 2026 elections.

123. The "Unlawful Voter Initiative" follows prior DHS enforcement actions targeted at voters and voter engagement organizations.

124. Following the highly publicized killings of U.S. citizens in Minneapolis during Operation Metro Surge, then-Attorney General Pam Bondi sent a letter to Minnesota Attorney General Keith Ellison conditioning the withdrawal of the Administration's unprecedented federal deployment on the State's acquiescence to unrelated federal government demands for sensitive voter roll data. The letter demonstrated the federal government's willingness to leverage immigration enforcement authorities to achieve its elections-related investigations objectives.

125. *The New York Times* reported that in June 2026, HSI agents worked with FBI agents to raid the offices and homes of numerous individuals affiliated with the Ohio Organizing

Collaborative, a nonpartisan get-out-the-vote group that conducts voter registration drives that serve everyday Ohioans, including working-class communities and communities of color—the same communities impacted by the Administration's intimidation campaign.[24] DHS agents actively participated in the operation, including by questioning staff members.[25]

126. Public reporting and communications with local election officials have also revealed that many DHS investigations are based on inaccurate data, flawed matching methodologies, and false positives that incorrectly identify lawful citizens or even individuals who were never registered to vote. Although DHS has devoted extraordinary investigative resources to identifying noncitizen voters, those efforts have produced only a small number of referrals and prosecutions nationwide relative to the tens of millions of registered voters exposed to examination. This failure to identify widespread fraud has not stopped the Administration's efforts to search for it.

127. Many of the claims of noncitizen voting that Defendants and other government officials have made since 2025 have relied primarily on the flawed Systematic Alien Verification for Entitlements ("SAVE") Program, a tool designed to verify the citizenship of applicants for government benefits. But the program's data sources are unreliable, and large-scale data-matching programs carry the inherent risk of false positives. Recent claims of noncitizen voter registrants based on the program illustrate its substantial flaws.

128. As one example, in October 2025, the Texas Secretary of State claimed that the SAVE Program was used to identify 2,724 noncitizens who were registered to vote in Texas.

---

[24] Madeleine Ngo, Nick Corasaniti & Hamed Aleaziz, *Homeland Security Intensifies Pursuit of Noncitizens on Voter Rolls*, N.Y. Times (Aug. 10, 2026), https://www.nytimes.com/2026/08/10/us/politics/noncitizens-vote-crackdown.html.

[25] *Id.*

However, local election officials, independent investigative reports, and court records found significant error rates in the SAVE Program's data, suggesting the total was vastly inflated.[26]

129. In Franklin County, Ohio, several individuals DHS reportedly flagged were never registered to vote in the first place. In one illustrative example, an agent admitted a false positive occurred, writing, "Oops! Turns out the voter is actually his father."[27]

130. DHS has also reportedly used another source of internal data, housed within the so-called HSI Innovation Lab, to target individuals for investigation. However, Innovation Lab staff have raised concerns about inaccuracies in the data and with DHS's plans to use it in elections-related investigations—an application for which the data was not designed.[28]

131. Plaintiffs fear that DHS's surge of resources to expand elections-related investigations will continue to rely on inaccurate data, leading to false positives that could result in DHS agents targeting lawful voters with intimidating surveillance, questioning, arrest, or prosecution.

**E. Defendants Have Used Federal Law Enforcement Personnel to Target U.S. Citizens, Causing Fear and Uncertainty for Eligible Voters.**

132. Defendants' record of injuring numerous U.S. citizens and killing at least two during recent immigration enforcement surges has amplified Plaintiffs' fears. In the past year, Defendants have improperly stopped, arrested, physically harmed, and even deported U.S. citizens, including people of color, naturalized citizens, and members of mixed-status families, in communities in which Plaintiffs' members reside.

---

[26] *Id.*

[27] Gabe Cohen, Priscilla Alvarez & Tierney Sneed, *Markwayne Mullin Uses Homeland Security to Further Trump's Voter Fraud Crusade*, CNN (Aug. 12, 2026), https://www.cnn.com/2026/08/12/politics/trump-homeland-security-voter-fraud-crusade.

[28] Peter Elkind et al., *Inside Trump's Failed Hunt for Noncitizen Voters*, ProPublica (Aug. 14, 2026), https://www.propublica.org/article/noncitizen-voting-trump-homeland-security-investigations.

133. Plaintiffs reasonably fear that Defendants' immigration enforcement actions demonstrate their readiness to deploy federal law enforcement personnel in the vicinity of voting locations in communities of color during the midterm elections without regard for the harms that their agents will likely cause to noncitizens and U.S. citizens alike, including eligible voters. Many of Plaintiffs' members fear they will face harassment, violence, or detention by federal agents during the 2026 elections despite being U.S. citizens and lawful voters.

134. Immigration agents' known and sanctioned racialized tactics have put Plaintiffs' members at further risk of harm and intimidation. Defendants have launched aggressive immigration enforcement operations in communities with substantial Black, Latino, and Asian populations. Such operations have steadily increased since summer 2026; ICE officials have been instructed that 2,000 arrests per day is the "new standard for enforcement."[29] Defendant DHS reportedly arrested 51,000 individuals in July 2026, up from 43,000 in June and the highest number recorded by this Administration.[30]

135. Plaintiffs have witnessed heavily armed and often masked federal agents conducting operations in residential neighborhoods, workplaces, courthouses and other governmental buildings, community gathering spaces, and other locations they frequent.

---

[29] Hamed Aleaziz, *Immigrant Arrests Surge to 10,000 in 5 Days as ICE Clamps Down*, N.Y. Times (July 1, 2026), https://www.nytimes.com/2026/07/01/us/politics/ice-immigrant-arrests-surge.html.

[30] Tim Henderson, *With New Tactics, ICE Reaches New High in Monthly Arrests*, Stateline (Aug. 10, 2026), https://stateline.org/2026/08/10/with-new-tactics-ice-reaches-new-high-in-monthly-arrest.

136. Plaintiffs are aware that Defendants have wrongfully confronted and arrested U.S. citizens during immigration enforcement operations. Widely circulated videos have shown federal agents stopping and questioning individuals without regard for their citizenship status.[31]

137. An October 16, 2025, press report revealed that at least 170 U.S. citizens, including children, had been improperly arrested during immigration enforcement operations since January 2025.[32] This is likely an undercount, in part because DHS has stopped reporting arrests or detentions of U.S. citizens.[33]

138. An Illinois State commission found that federal agents arrested at least seventy-five U.S. citizens during DHS's Operation Midway Blitz in Chicago from September to December 2025.[34] The commission also documented repeated uses of force against U.S. citizens, including journalists, protesters, clergy members, and bystanders.[35]

139. A July 8, 2026, press report disclosed that federal immigration agents had shot at least twenty-three people since 2025. Of those shot, six died, including U.S. citizens.[36]

---

[31] FOX 9 KMSP, *Minneapolis Woman Calmly Resists ICE Demand for ID, Birth Country*, Fox 9 (Jan. 12, 2026), https://www.fox9.com/news/minneapolis-woman-calmly-resists-ice-demand-id-birth-country.amp; Video posted by LongTime FirstTime (@LongTimeHistory), X (Sep. 14, 2026), https://x.com/LongTimeHistory/status/2099453858397466626?s=20.

[32] Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days.*, ProPublica (Oct. 16, 2025), https://www.propublica.org/article/immigration-dhs-american-citizens-arrested-detained-against-will.

[33] Mark Krass & Margy O'Herron, *Despite Budget Surge, ICE Fails to Make the Country Safer*, Brennan Ctr. for Just. (Feb. 11, 2026), https://www.brennancenter.org/our-work/research-reports/despite-budget-surge-ice-fails-make-country-safer.

[34] Ill. Dep't of Hum. Rts., *Illinois Accountability Commission: Final Report* 20 (Apr. 2026), https://ilac.illinois.gov/content/dam/soi/en/web/ilac/documents/final-report/IAC-Final-Report-April-2026.pdf.

[35] *Id.* at 5.

[36] Allison McCann, *At Least 23 People Have Been Shot at by Federal Immigration Agents Since Last Year*, N.Y. Times (July 16, 2026), https://www.nytimes.com/2026/07/08/us/immigration-agent-shootings-vehicles.html.

140. DHS's Operation Metro Surge in Minnesota, from December 2025 through February 2026, heavily targeted communities that Plaintiffs serve, including predominantly Somali and Southeast Asian neighborhoods in Minneapolis and St. Paul, Minnesota.

141. Members of Plaintiffs' organizations in Minnesota saw federal agents use aggressive enforcement tactics, including going door-to-door demanding residents verify citizenship, and forcibly removing elder citizens from their homes. MN8 received reports from community members that immigration agents knocked on their doors with photos of Hmong and Lao people, asking if they knew them. When they didn't recognize them, agents would ask where their Hmong neighbors lived. If they declined to answer, officers asked if they knew where to find any Asian people in the neighborhood. MN8 members now know that federal immigration officers will pursue individuals based on their race, regardless of citizenship status.

142. Operation Metro Surge instilled a fear of interactions with immigration officers in MN8's membership and constituents that endures to the present day. Encounters with ICE officers were a daily occurrence and use of force was prevalent. During the Operation, multiple MN8 members were shoved, sprayed with pepper spray and tear gas, or had handguns and AR-15 rifles pointed in their direction. Immigration officers also ignored members' rights, threatening to detain people who declined to answer questions without an attorney.

143. DHS operations in other states, including California,[37] Florida,[38] North Carolina,[39] and Texas,[40] have also led to aggressive and unjustified uses of force, racial profiling, and intimidation of U.S. citizens.

144. These reports have further heightened Plaintiffs' fears about the dangers of encountering federal law enforcement agents and have discouraged them from attending community events, engaging in voter education and outreach efforts, publicly expressing their views, and exercising their right to participate fully in civic and political life.

145. For example, one Los Angeles SEIU member, who lived through ICE's enforcement operations in California last year, will be changing the way she votes because she fears that her elderly parents, who are naturalized U.S. citizens, could be targeted despite their lawful status because they resemble and speak like individuals who had been targeted by ICE.

---

[37] FOX 11 Los Angeles, *79-Year-Old US Citizen Pinned by ICE Agents* (YouTube, Sep. 25, 2025), https://www.youtube.com/watch?v=LQV6UraLvrc; Tracy Lehr, *Oxnard Man Released After Being Detained by ICE Agents While Filming Father's Arrest*, KEYT-TV (June 19, 2025), https://keyt.com/news/ventura-county/2025/06/17/u-s-citizen-held-by-ice-released/; Josh DuBose, *DHS Secretary Kristi Noem Attends ICE Raid at Los Angeles County Home*, KTLA 5 (June 13, 2025), https://ktla.com/news/local-news/dhs-secretary-kristi-noem-attends-ice-raid-at-home-of-pregnant-l-a-county-mother/; Nicole Acevedo, *A Pregnant U.S. Citizen Went to the Hospital After Immigration Agents Detained Her*, NBC News (June 11, 2025), https://www.nbcnews.com/news/latino/pregnant-us-citizen-went-hospital-immigration-agents-detained-rcna212033; Jon Schuppe & Erik Ortiz, *Trump's DHS Immigration Enforcement Officers Shot 14 People from September 2025 to February 2026. Here's What to Know.*, NBC News (Mar. 4, 2026), https://www.nbcnews.com/news/us-news/ice-shootings-list-border-patrol-trump-immigration-operations-rcna254202.

[38] Clare Considine, *Immigration Agents Told a Teenage US Citizen: 'You've got no rights.' He Secretly Recorded his Brutal Arrest*, The Guardian (July 25, 2025), https://www.theguardian.com/us-news/2025/jul/25/florida-teen-immigration-arrest.

[39] George Chidi, *'I lose my liberty in that moment': Charlotte Shuts Down as Citizens and Noncitizens alike Face ICE Arrests*, The Guardian (Nov. 20, 2025), https://www.theguardian.com/us-news/2025/nov/20/charlotte-north-carolina-ice-raids.

[40] Pooja Salhotra & Edgar Sandoval, *A Fatal ICE Shooting Occurred in Texas Months Before Renee Good's Killing*, N.Y. Times (Feb. 20, 2026), https://www.nytimes.com/2026/02/20/us/ruben-ray-martinez-ice-shooting-texas.html.

146. Plaintiffs are aware that DHS operations have resulted in the deaths of numerous people. A nonprofit organization tracking gun violence summarizes that during this Administration, DHS agents have shot firearms at civilians thirty times; killed nine of these people and seriously injured fourteen others; and held bystanders, protesters, or other people at gunpoint under questionable circumstances in at least forty-nine other instances.[41]

147. In a single month, DHS agents shot and killed two U.S. citizens in Minneapolis. A few months later, again in quick succession, DHS agents publicly shot and killed two people during traffic stops in Maine and Texas. These shootings were highly reported and became known to Plaintiffs, further raising their fears that anyone, regardless of citizenship, could face violence if they encounter DHS agents.

148. Defendants have consistently reacted to these killings, uses of force, and mistaken arrests by pronouncing "absolute immunity" for themselves and the agents responsible for these acts of violence.[42]

149. Defendants' operations demonstrate what an armed federal presence means in communities of color: mass arrests, unlawful entries into private residences, and the threat of federal agents exacting physical violence and killing civilians. These actions further contribute to Plaintiffs' reasonable perception that encounters with federal immigration agents during the 2026 midterm elections carry substantial risks of physical harm, harassment, surveillance, and retaliation, even for U.S. citizens.

---

[41] Jennifer Mascia, *How Many People Have Been Shot in ICE Raids?*, The Trace (Aug. 17, 2026), https://www.thetrace.org/2025/12/immigration-ice-shootings-guns-tracker/.

[42] Safia Samee Ali, *Do ICE Officers Have Absolute Immunity?*, News Nation (Jan. 14, 2026), https://www.newsnationnow.com/us-news/immigration/do-ice-officers-have-absolute-immunity/.

150. For example, in July 2025, DHS officials conducted a highly visible show-of-force march across MacArthur Park in Los Angeles, California, while federalized National Guard troops were stationed outside the park in military vehicles. Dubbed "Operation Excalibur," the Administration stated the march was intended to "demonstrate, through a show of presence, the capacity and freedom of maneuver of federal law enforcement within the Los Angeles Joint Operations Area."[43]

151. In October 2025, DHS used special-forces-like tactics to raid an apartment building in Chicago, including deploying combat-equipped agents by fast-rope from a low-flying Blackhawk helicopter. DHS hired a camera crew, embedded the crew with the raid agents, and later released a glossy compilation of footage from the raid as promotional material.

152. Plaintiffs' members have seen this racialized and violent imagery. Defendants' public messaging, alongside Defendants' heightened enforcement activity in communities of color, reinforces Plaintiffs' fears that Defendants may target them regardless of their citizenship status.

153. Defendants have also wielded the power of the Executive to seek to exclude immigrant communities from the American polity.

154. President Trump has twice attempted to unlawfully restrict birthright citizenship through Executive Order.[44]

155. Defendants have also engaged in a highly publicized campaign to "prioritize and maximally pursue denaturalization proceedings."[45] Denaturalization is a historically rare and

[43] *Newsom v. Trump*, 797 F. Supp. 3d 1092, 1104–05 (N.D. Cal. 2025).

[44] Proclamation No. 14418, 91 Fed. Reg. 51991 (Aug. 11, 2026), https://www.whitehouse.gov/presidential-actions/2026/08/continuing-to-protect-the-meaning-and-value-of-american-citizenship/; Proclamation No. 14160, 90 Fed. Reg. 8449 (Jan. 29, 2025), https://public-inspection.federalregister.gov/2025-02007.pdf.

[45] Memorandum from Brett A. Shumate, Assistant Attorney General to All Civil Division Employees of the U.S. Department of Justice, (June 11, 2025), https://www.justice.gov/civil/med

weighty process to deprive naturalized Americans of their citizenship. It results in the loss of important government benefits, deprivation of the right to vote and other privileges and immunities of U.S. citizenship, and immediate risk of removal from the country.

156. Defendants' denaturalization efforts, coupled with their expansive elections-related investigatory efforts, have confused many of Plaintiffs' members and chilled their civic engagement activities. For example, Plaintiff MN8 members who are naturalized citizens regularly seek clarity on whether they are still permitted to vote, whether voting could jeopardize their citizenship, or whether they could face denaturalization because of Defendants' focus on noncitizen voting and immigration enforcement.

157. Plaintiffs' members report that Defendants' actions have fundamentally altered their understanding of what citizenship protects. Members who previously believed that naturalization provided security and full inclusion in civic life now fear that their citizenship status may be questioned or revisited when they simply exercise their right as citizens to vote. For these members, highly publicized efforts to restrict birthright citizenship and target communities of color with false allegations of voter fraud reinforce the perception that even lawfully obtained citizenship may not shield them from investigation, questioning, or other adverse government action.

158. Taken together, Defendants' actions reinforce Plaintiffs' fears about voting and engaging in the electoral process, causing them to be intimidated.

ia/1404046/dl; Ali Rogin, Kyle Midura & Ali Schmitz, *DOJ Deploys Tactic to Strip Naturalized Americans of Citizenship*, PBS (Aug. 13, 2026), https://www.pbs.org/newshour/show/doj-deploys-tactic-to-strip-naturalized-americans-of-citizenship.

### F. Defendants Have Dismantled Internal Guardrails Against Election Interference While Concealing Records About Preparations to Deploy Federal Agents in the Vicinity of Voting Locations.

159. Federal law expressly prohibits armed federal agents from being present in the vicinity of voting locations. Congress made it a federal crime when "an officer of the Army or Navy, or *other person in the civil*, military, or naval service of the United States, orders, brings, keeps, or has under his authority or control any troops or *armed men* at any place where a general or special election is held, unless such force be necessary to repel armed enemies of the United States." 18 U.S.C. § 592 ("Section 592") (emphasis added).

160. When first enacted, the statute also provided an exception that authorized federal officers "to keep the peace at the polls." Pub. L. No. 38-52, ch. LII, 13 Stat. 437 (1865). However, Congress repealed that exception in 1909, at least in part because it feared that federal authorities could point to any kind of disturbance as a pretext to deploy troops. Pub. L. No. 350, ch. 321, 35 Stat. 1088, 1092–93 (1909).[46]

161. Congress did not stop at Section 592. It also enacted fifteen other statutes—nine criminal and six civil, including Section 11(b) of the VRA—to ensure there were robust federal protections against intimidation and interference in elections, including intimidation or interference by federal agents.

162. Consistent with Section 592 and other federal law prohibiting government interference with elections, longstanding DHS and DOJ policy has restricted federal law enforcement from being present in the vicinity of voting locations.

---

[46] *The 1879 Rider Wars*, Off. of the Historian & Off. of Art & Archives, Off. of the Clerk, U.S. House of Representatives, https://history.house.gov/Historical-Highlights/1851-1900/1879_rider_wars/ (last visited Sep. 17, 2026).

163. The 2017 edition of DOJ's Federal Prosecution of Election Offenses Manual instructed that federal agents may not be stationed at open polling places unless specifically authorized by statute; emphasized that state law generally controls who may enter or approach polling places; warned that unauthorized federal presence could violate state sovereignty and the federal statutory prohibition on stationing armed federal personnel at polls, 18 U.S.C. § 592; and cautioned that even covert operations near polling places risk chilling lawful voting activity.[47]

164. Defendants have begun removing or suspending these guidance documents explaining restrictions on federal law enforcement activity in the vicinity of voting locations.

165. DOJ removed the 2017 edition of its Federal Prosecution of Election Offenses Manual from its website without public explanation sometime between November 2025 and January 2026, refused to answer congressional inquiries about that removal, and later suspended related Justice Manual consultation requirements while revisions were pending.

166. Public reporting indicates that officials and career staff who previously resisted election interference or worked on election security have been removed, reassigned, or replaced, including numerous DHS personnel specializing in elections-related physical and cybersecurity risks.[48]

167. Ongoing Freedom of Information Act litigation confirms that Defendants possess thousands of records concerning the deployment, posting, or positioning of federal law

---

[47] Richard C. Pilger, *Federal Prosecution of Election Offenses*, DOJ, Elections Crime Branch, at 85, 96–97, 120 (Dec. 2017), https://web.archive.org/web/20251003141327/https://www.justice.gov/criminal/file/1029066/dl?inline=.

[48] Doug Bock Clark & Jen Fifield, *Inside Trump's Effort to "Take Over" the Midterm Elections*, ProPublica (Apr. 13, 2026), https://www.propublica.org/article/trump-midterm-elections-takeover.

enforcement or armed forces in the vicinity of polling places, ballot drop boxes, and election offices during voting and certification periods.[49]

168. In that case, DHS Headquarters has identified 2,165 potentially responsive pages; ICE has identified 11,108 pages; and CBP, after initially denying that it had any such records, reversed course and identified approximately 1,722 responsive records. The existence of the responsive records reinforces the likelihood that Defendants are preparing for federal immigration enforcement activity in the vicinity of voting locations while obscuring the details of those preparations.[50]

169. The harm of Defendants' removal of internal guardrails is already materializing. During the 2026 primary elections, federal agents reportedly conducted enforcement operations in the vicinity of active voting locations in multiple states, including California, Texas, and Pennsylvania.[51] In New York, video footage captured federal agents entering a polling site during

[49] *See, e.g.*, Compl. Ex. 7, *Democratic Nat'l Comm. v. Dep't of Just.*, No. 1:26-cv-825 (D.D.C. Mar. 10, 2026), Dkt. No. 1 (ICE FOIA request), https://storage.courtlistener.com/recap/gov.uscourts.dcd.290191/gov.uscourts.dcd.290191.1.7.pdf; Min. Order, *Democratic Nat'l Comm. v. U.S. Dep't of Just.*, No. 1:26-cv-825 (D.D.C. July 31, 2026) https://www.courtlistener.com/docket/72384565/democratic-national-committee-v-us-department-of-justice/?filed_after=&filed_before=&entry_gte=&entry_lte=&order_by=desc#minute-entry-472868035.

[50] *Id.*; Joint Status Report at 4, *Democratic Nat'l Comm. v. U.S. Dep't of Just.*, No. 26-0825 (D.D.C. Aug. 7, 2026), Dkt. No. 24, https://storage.courtlistener.com/recap/gov.uscourts.dcd.290191/gov.uscourts.dcd.290191.24.0.pdf.

[51] Michael Karlis, *ICE Conducts Enforcement Action at San Antonio Voting Location, Witnesses Say*, San Antonio Current (May 20, 2026), https://www.sacurrent.com/news/san-antonio-news/ice-conducts-enforcement-action-at-san-antonio-voting-location-witnesses-say/; Wes Woods II, *ICE Presence Outside Simi Valley Vote Center Raises Alarms*, Ventura County Star (June 2, 2026), https://www.vcstar.com/story/news/politics/elections/2026/06/02/ice-presence-outside-simivalley-vote-center-raises-alarms/90378216007/; Bridging Divides Initiative, Princeton Univ., *Early Warning Advisory: Assessing the Risk of Federal Immigration Agent Deployments to Polls* (June 3, 2026), https://bridgingdivides.princeton.edu/sit

the June 2026 primary election and confronting a poll worker regarding a social media post critical of DHS.[52]

170. These incidents have added to Plaintiffs' fears that they will encounter more federal agents if they attempt to vote or engage in other elections-related activities during the 2026 general elections.

**G. Plaintiffs Fear Participating in the 2026 Midterm Elections Because of Defendants' Threatening and Intimidating Conduct.**

171. Defendants' statements and actions have made voters, including Plaintiffs and their members, afraid of appearing at polling places, helping others vote, serving as election volunteers, and advocating for their political beliefs and preferred candidates.

172. Plaintiffs and the staff, members, and eligible voters they represent have planned to engage in numerous election-related activities during the 2026 elections, including voting, registering their neighbors to vote, encouraging family and friends to vote, and assisting community members with casting their ballots.

173. But Plaintiffs fear that Defendants' actions will expose them to physical violence, surveillance, and harassment if they participate in the electoral process.

174. Specifically, Plaintiffs fear that they will face baseless and coercive questioning, assault, detention, or other adverse consequences by Defendants or their agents for simply showing up to vote or providing services to mobilize or assist other voters.

---

es/g/files/toruqf6646/files/documents/BDI_Early%20Warning%20Advisory_Immigration%20Deployments%20to%20Polls_June2026.pdf.

[52] Patrick Whittle, *Election Worker Says Federal Officers Confronted Her at Polls over Social Media Post Criticizing ICE*, Associated Press (June 26, 2026), https://apnews.com/article/ice-poll-worker-syracuse-fa082f8ac25d019e93b526fdef37df6c.

***Plaintiff NAACP***

175. The NAACP, as an organization, its individual units, and its members, have been harmed by the diversion of resources to address voter concerns over ICE and federal law enforcement at polling sites. This includes, for example, reshaping its typical fall training voter curriculum to include new training materials regarding ICE presence at polling sites on September 29, 2026. Individual units are also diverting resources away from typical activities to get out the vote, such as organizing rides to the polls, toward activities designed to monitor and warn voters of ICE presence at the polls. They will be required to divert further resources to these efforts if Defendants' conduct is not enjoined.

176. NAACP's members live and vote in the communities where ICE has been active. NAACP members fear that they or someone in their family, neighborhood, or community will be affected by immigration enforcement activity. NAACP members have reported that fear of immigration enforcement has caused them or people they know to avoid going to work, school, or the grocery store, taking walks in their neighborhoods, and participating in elections.

177. NAACP members fear that federal immigration and law enforcement will change how they take part in the November 2026 election, including changing their method of voting and making members less likely to volunteer as election monitors, less likely to serve as poll workers, less likely to volunteer to help register others to vote, and less likely to drive voters to the polls. Defendants' actions tell members that armed ICE officers may be inside or near the polling place when they arrive to vote, interpret for a neighbor, or help a voter who has been turned away. NAACP members have observed federal immigration enforcement at and near polling places and registered its effect on voters, volunteers, and election officials.

178. As a consequence of Defendants' actions, NAACP is now directing resources to address voter intimidation that could have been used elsewhere to further their missions, and they will be required to divert further resources to these efforts if Defendants' conduct is not enjoined.

179. The use of law enforcement to intimidate Black voters at the polls is a method deeply intertwined with the broader policing of Black communities and the myth of widespread voter fraud developed during Reconstruction to undermine the civic participation of the formerly enslaved population. Fearmongering about "illegal voting" is the modern version of the racist narratives that were used to justify poll taxes, literacy tests, and arbitrary "character" assessments for generations.

180. Placing police directly in the path of Black voters makes it difficult for organizers to register voters and decreases turnout. In the Florida primary election, for example, local branch members reported a roadside checkpoint in Lee County where officers were conducting immigration enforcement on the main access road to a voting precinct with a large Black and Latino voting population.

181. The presence of armed agents depresses participation by making Black voters feel like their political participation is perceived as "suspicious" and sows doubt in the election itself.

182. The prospect of interacting with armed agents is particularly intimidating for Black voters, including the communities NAACP serves, because of the extensive history in these communities of frequently violent voter intimidation and interference conducted by the federal government. That is due, in part, to the history of voter suppression that Black people have had to endure.

183. Fears of the presence of armed agents, including ICE agents, around polling sites have interfered with voter assistance services and required a restructuring or rededication of

resources for NAACP's mobilization efforts. For example, the NAACP Office of the General Counsel has received requests for legal counsel regarding armed ICE agents at the polls resulting in voter intimidation and discrimination.

184. NAACP's staff and volunteers must expend time and resources to coordinate those efforts across NAACP's national, state conference, and local units.

***Plaintiff Mi Familia en Acción***

185. MFA's U.S. citizen members fear that the presence of federal agents, including ICE agents, around polling sites will impede their right to vote by potentially subjecting them to adverse consequences, including retaliation, physical harm, or negative legal consequences if they attempt to exercise their right to vote.

186. Fears of violent encounters with law enforcement have long been prevalent among Plaintiff MFA's limited-English-proficient and Latino members and the constituencies MFA serves. These individuals and communities have historically faced higher rates of racial profiling, harassment, and heightened scrutiny during interactions with law enforcement. As Defendants' anti-immigrant rhetoric and highly publicized deployments of federal immigration agents have escalated, these members' and communities' fears have grown significantly.

187. Due to Defendants' conduct, MFA members believe DHS racially profiles them based on their accents, ethnicity, and skin colors.

188. Defendants' insinuations that they will send federal agents to polling places and lack of accountability for DHS's wrongful abuses of U.S. citizens, including use of lethal force, during immigration enforcement surges and noncitizen voting investigations have made the threat to MFA members who wish to participate in the 2026 elections urgent and concrete.

189. Many of MFA's members now reasonably believe that immigration enforcement operations, including those related to investigating purported "election fraud," blatantly disrespect individuals' citizenship status and rights and will subject limited-English-proficient and Latino voters, election protection workers, and voter registration canvassers to surveillance, investigation, harassment, or physical force based on their appearance or accent alone.

190. MFA's members reasonably fear that federal law enforcement agents' pattern of unlawful, violent actions heightens the risk that MFA members will encounter excessive force at the polls.

191. Unlike in previous election cycles, MFA cannot advise its members that their voting rights will be protected or that there is a low risk of interference. This vacuum of assurance from MFA and other civic engagement organizations contributes to MFA members' fearfulness.

192. Latino communities have also had longstanding concerns about government collection and use of sensitive personal information. MFA's members, particularly elders and immigrant and mixed-status families, are generally wary of sharing their Social Security numbers, identity documents, or other personal information with government agencies. Defendants' highly visible immigration enforcement operations, coupled with their repeated assertions that noncitizen voting is widespread and their investigations into voting and civic-engagement activities and organizations, have fostered fear among MFA's members that participation in civic life could expose them or their family members to government scrutiny. This chilling effect is particularly acute for naturalized citizens, members of mixed-status households, and individuals living in communities that have experienced immigration enforcement activity.

193. As a result, MFA members have altered their own behavior. MFA's U.S. citizen members who would otherwise feel comfortable registering to vote and participating in civic

activities have become more reluctant to do so in light of Defendants' conduct. MFA members reasonably fear that participating in voter registration drives, community meetings, voter education programs, and other civic engagement activities may subject them or their family members to increased government scrutiny because of their ethnicity, language, family relationships, or perceived immigration status. As a result, some MFA members have become less willing to register to vote, engage with voter outreach efforts, attend community events, or otherwise participate fully in the democratic process.

194. Defendants' actions have also deterred some of MFA's most active members from participating in the civic engagement activities they would ordinarily undertake. Veteran members who have undertaken canvassing, voter registration, and election protection work in the past have scaled back or opted out of voter engagement activities because they fear those activities may expose them to intimidation, investigation, surveillance, or encounters with federal law enforcement. Similarly, some younger MFA members who participate in leadership-development and civic-engagement programs have become more hesitant to advocate publicly for voting rights and democratic participation because they and their families fear that such advocacy may draw unwanted attention to themselves or their communities.

195. Upon information and belief, during the Texas primary, an MFA member serving as Texas Program Manager at a party at the polls event at a polling location in Houston identified a DHS vehicle in the parking lot. This MFA member feared that DHS was at that polling location to intimidate voters. Seeing the DHS vehicle in a parking lot next to this polling site made this MFA member feel less safe doing election protection work and less safe casting their own ballot in that primary election and in the upcoming elections.

196. Even MFA members who continue to engage in voter outreach and civic participation efforts have been forced to change how they interact with community members, undermining MFA members' efforts to build political power and civic engagement within Latino communities. MFA members report that community residents increasingly react with fear and suspicion to discussions about voting, civic engagement, and community concerns. As a result, MFA members have altered their outreach strategies, messaging, and interactions in an effort to address those fears. MFA members are also increasingly concerned that activities to get out the vote, educate voters ahead of the upcoming elections, or participation in civic engagement activities in general may increase the likelihood of investigations and physical encounters with federal law enforcement, making those activities feel unsafe.

***Plaintiff OCA–Asian Pacific American Advocates***

197. OCA members fear that the presence of federal agents, including ICE agents, around polling sites, voter registration events, ballot-drop locations, and other election-related activities will burden their ability to exercise the right to vote by subjecting them to intimidation, scrutiny, harassment, investigation, or potential encounters with law enforcement. These fears are particularly acute among immigrants, naturalized citizens, members of mixed-status families, older voters, and voters with limited English proficiency.

198. Fears of profiling, discrimination, and heightened scrutiny by government officials have long been prevalent among many OCA members, particularly South Asian, Southeast Asian, and other immigrant communities. Many OCA members have historically experienced or witnessed bias, suspicion, and unequal treatment based on their race, ethnicity, language, accent, or perceived immigration status. As a result, concerns about law enforcement presence around civic and electoral activities existed long before the conduct challenged in this action.

199. Many OCA members rely on language assistance, community-based voter education, and trusted civic engagement organizations to participate in elections. These members are especially sensitive to government actions that suggest immigrants, naturalized citizens, and communities of color may face scrutiny when engaging in public life or exercising their right to vote.

200. As Defendants' anti-immigrant rhetoric, repeated assertions that noncitizen voting is widespread, and highly publicized deployments of federal immigration agents have escalated, these members' fears have grown significantly. Many OCA members now believe that citizenship status provides little protection from Defendants' sweeping immigration and election-related enforcement initiatives.

201. These fears have been reinforced by OCA members' experiences. One OCA member, a Minnesota resident who has been registered to vote since becoming eligible, is the child of Southeast Asian refugees who later became naturalized U.S. citizens. While serving as an election judge in 2020, they observed firsthand how misinformation about noncitizen voter fraud fueled suspicion, hostility, and anger toward election workers. More recently, as a resident of Minnesota, they witnessed the impact of Defendants' immigration enforcement operations on immigrant and refugee communities, including reports of U.S. citizens being questioned, scrutinized, or caught up in enforcement activities despite their citizenship status.

202. Based on those experiences and Defendants' recent conduct, they fear that voting, serving as an election judge, or assisting other voters in the 2026 elections could expose them to threats, harassment, intimidation, or physical violence from the federal government. They believe they face an elevated risk because they are a Southeast Asian American and a child of naturalized

citizens and are therefore considering refraining from election-related activities, including election judge service, due to their fear of intimidation by Defendants.

203. As another example, OCA members in the District of Columbia experienced a significant presence of federalized National Guard troops during the June 2026 primary election as they visited ballot drop boxes or polling places to vote. The presence of uniformed soldiers increased OCA members' sense of fear and intimidation, and they are worried about the consequences of encountering more uniformed officers during the general election.

204. As a result of Defendants' conduct, OCA members have experienced burdens on their voting and voting-related activities and have had to alter their behavior. OCA chapters work with significant numbers of newly naturalized citizens and are aware of substantial fear among their members regarding participation in election-related activities. Without assurances that federal law enforcement will not be present at polling places or other election-related events, many members and constituents are having difficulty making plans to vote, volunteering at the polls, or assisting other voters. Members frequently seek guidance from OCA regarding how to respond if federal agents are present on Election Day and whether it is safe to participate in the electoral process.

205. OCA anticipates decreased voter turnout in Asian American communities due to Defendants' conduct and has put considerable effort into recruiting volunteers and staff to bolster voter turnout efforts. For example, in anticipation of potential law enforcement presence at poll sites, OCA's Houston chapter has spent more time recruiting additional volunteers for increased support at the poll sites and training those volunteers, instead of implementing voter outreach, registration, and community education programs. Similarly, OCA's Wisconsin members have

heightened fears of law enforcement encounters because Wisconsin shares a border with Minnesota and they have heard about the fearful climate in Minnesota.

206. Defendants' conduct has also deterred some of OCA's most active volunteers and community leaders. OCA and its members fear that voting, assisting voters, or conducting voter education, registration, and mobilization activities will expose them to threats and intimidation by Defendants and their agents. Members who would otherwise feel comfortable voting, assisting voters, serving as election workers, attending voter education events, or participating in civic-engagement activities have become increasingly reluctant to do so. Some members have become less willing to appear at polling places or election events altogether, while others are reconsidering whether and how they will cast their ballots. These burdens on voting and voting-related activities are a direct consequence of Defendants' conduct.

207. OCA members report that community members increasingly react with fear and suspicion to discussions about voting, elections, and civic participation. OCA's voter education efforts in this regard have been severely disrupted. As a result, OCA members have changed their outreach strategies and conversations to focus on addressing fears about immigration enforcement and law enforcement encounters rather than encouraging civic participation and voter engagement. OCA wants to provide members with accurate information on how to vote safely but cannot provide guidance because the staff does not know what to expect from federal law enforcement during the election period. OCA's production of voter resources, such as voter guides, has been delayed by the organization's efforts to understand and track the escalating and dynamic threats posed by Defendants' statements and conduct.

***Plaintiff NUL***

208. NUL's members fear that the presence of federal agents, including ICE agents, around polling sites will impede their right to vote by potentially subjecting them to adverse consequences, including retaliation, physical harm, or negative legal consequences, if they attempt to exercise their right to vote. Even citizens without criminal or immigration concerns can feel intimidated by the presence of ICE or other federal law enforcement agents around polling places. The presence of federal law enforcement depresses turnout by Black voters, including NUL's members, because it makes voters feel like their political participation is perceived as "suspicious."

209. Because of the extensive history of suppression of Black voters, including violent voter intimidation and interference, NUL's members find the prospect of federal law enforcement at the polls especially intimidating. These fears are particularly pronounced given the Administration's targeting of Black communities by DHS, such as increased ICE presence and enforcement activity in Springfield, Ohio, home to a large Haitian-American community, and Minnesota and Maine, both of which have large Somali-American communities, as well as the long-term National Guard occupation of Washington, D.C., a city whose population is over 41% Black. Such actions have already subjected Black communities to increased surveillance, questioning, retaliation, threat of physical harm, and threat of negative criminal or immigration actions. The warrantless arrest and detention of twenty-two people, including one U.S. citizen, in Chicago, Illinois, and detention of the same U.S. citizen in Alabama twice in two separate ICE raids conducted within a month, compound these concerns. NUL's members reasonably fear that attempting to exercise their right to vote when confronted with federal agents around polling sites might likewise subject them to adverse collateral consequences. These credible fears chill members' willingness to exercise their lawful right to vote. Because of these fears, members are

considering switching from their preferred method of in-person voting to vote-by-mail if permitted to do so; not participating in voter registration activities; or abstaining from voting altogether.

***Plaintiff MN8***

210. Fears of immigration enforcement, detention, deportation, and government surveillance have long been prevalent among MN8's members and the Southeast Asian communities it serves. All of MN8's members are refugees turned naturalized citizens, members of mixed-status families, or individuals with close ties to communities that have experienced immigration enforcement. Because MN8's members have firsthand experience with the consequences of detention and deportation, they have long been sensitive to the possibility that interactions with government officials may result in scrutiny, intimidation, family separation, or other adverse consequences.

211. Those fears intensified dramatically during and after Operation Metro Surge, when MN8's members lived through the fear Defendants created via their tactics, including door-to-door questioning of Asian residents and federal agents' killing of two U.S. citizens. Members report that Defendants have retained immigration agents in Minnesota even after formally concluding Operation Metro Surge. Community members have sheltered in place and avoided going to work, school, and public places because they fear further violent encounters with federal officers. For example, after hearing that immigration agents detained people even on their way to medical appointments, one elderly member who needed new dentures ate soft food for months because she was afraid to leave the house to see the dentist. These were the uncomfortable choices MN8 members made every day to survive Operation Metro Surge.

212. Defendants' conduct has burdened MN8's members' voting and voting-related activities, because many of the communities MN8 serves already face barriers to voting, including

limited access to transportation, language access challenges, and limited access to election information. Community members who once welcomed voter outreach and assistance have become less willing to answer their doors, attend community events, seek help, or accept assistance getting to the polls because of concerns about encounters with federal agents. Community members frequently ask MN8 what they should do if ICE agents appear at polling places or interrupt other election-related activities. Voters are questioning whether it is worth risking their own or their family's safety in order to participate in elections. Some elders and families have expressed concerns about leaving their homes to vote or deliver mail ballots because they fear encounters with federal agents.

213. These fears have created widespread confusion among naturalized citizens and immigrant communities regarding their rights. As mentioned above, MN8's naturalized citizen members have the impression that their right to vote is in jeopardy due to Defendants' denaturalization initiative. Community members have expressed fears that voting, registering, or assisting relatives at voting locations could draw attention to themselves or undocumented family members.

214. As a result of Defendants' conduct, MN8 members have altered their behavior, including during the 2026 primary elections. MN8 volunteers spent substantial time addressing fears about federal law enforcement and explaining how to respond to encounters with immigration agents rather than focusing on traditional voter education and turnout efforts. In one instance, MN8 members had to guarantee safe transportation to the polls for a Vietnamese American elderly voter who wanted to vote but was afraid to leave her home for fear of federal law enforcement. The elderly voter accepted assistance only after MN8 explained that they were trained and prepared to respond to law enforcement agents.

215. Defendants' conduct has also deterred some of MN8's most active volunteers and community leaders. Longtime volunteers who previously provided rides to voting locations, translation assistance, phone banking, canvassing, voter education, and other election-related support have stepped back from those activities because of fear, emotional trauma, or direct experiences with immigration-enforcement operations. MN8 members who previously assisted elders and other community members in getting to the polls now feel compelled to consider whether additional measures are needed to protect themselves and others from intimidation or confrontation at voting sites.

216. Defendants' conduct has forced Plaintiffs to bear the risk of harmful intimidation, surveillance, harassment, and physical violence by federal agents merely for choosing to vote, attempting to vote, or urging and aiding others to vote. The effect of Defendants' actions is to chill Plaintiffs' engagement in the 2026 electoral process, whether through casting ballots, serving as election workers, aiding family members with voting, or educating and turning out their neighbors to the polls. Defendants' infringement on Plaintiffs' exercise of the franchise violates federal law and must be enjoined to prevent further harm.

***Plaintiff SEIU***

217. Many SEIU members live and work in cities where immigration agents have conducted large-scale enforcement operations, including Los Angeles, Chicago, and the Twin Cities. SEIU members with lawful status, including U.S. citizens, have also been targeted, questioned, and/or detained by immigration authorities over the past year.

218. Federal immigration enforcement operations have disrupted members' daily lives, with some members avoiding routine activities such as shopping, driving, attending appointments, or spending time outside. In particular, Latino SEIU members, including U.S. citizens, have also

avoided these activities out of fear of being stopped or detained because of their appearance, language, or accent.

219. As a result, SEIU members also report changing their voting behavior because of ICE activity. A Minnesota SEIU member and regular voter who previously drove elderly voters to the polls was stopped by ICE during Operation Metro Surge. As a result, the member now plans to vote with friends and family for safety, while the member's mother no longer plans to vote because she fears retaliation from ICE. Another Minnesota SEIU member, a U.S. citizen, was stopped twice by ICE during Operation Metro Surge, including once when agents mistakenly suspected the member was someone they were seeking. After being questioned about their citizenship status and seeing ICE agents stationed near their usual polling place, a church, the member now plans to vote early, at a different polling location, and with a group of voters.

220. A Los Angeles SEIU member who has always voted in person now plans to vote by mail because of concerns that federal agents may be present near polling places. Another Los Angeles SEIU member, who lived through immigration enforcement operations in Southeast Los Angeles in summer 2025, fears that her elderly parents, who are naturalized U.S. citizens, could be targeted despite their lawful status because they resemble and speak like individuals who have been detained by ICE. As a result, rather than voting in person with their family, her parents plan to return their mail ballots at a drop box well before Election Day.

221. Defendants' actions and rhetoric have caused many SEIU members to change when, where, and how they vote and have chilled participation in voting-related activities more broadly. These members are also urging members of their communities to take the same precautions, extending the ripple effect of Defendants' intimidating conduct.

***Plaintiff AFT***

222. Defendants' record of violent enforcement tactics, repeated claims of noncitizen voter fraud, and statements asserting authority to be present in the vicinity of voting locations have caused fear among AFT's members. AFT members fear that the presence of federal agents in the vicinity of voting locations could expose them to retaliation, physical harm, or negative legal consequences if they attempt to exercise their right to vote.

223. AFT's members live and vote in communities in which federal agents have executed immigration enforcement operations. AFT members have increasingly spent time addressing fears about immigration authorities, reassuring students, patients, and families about their rights, and responding to concerns about immigration enforcement activity. AFT members have reported that the prospect of encountering immigration agents has caused them to fear going to work themselves and has, in many cases, caused their students, students' parents, and patients to avoid going to school or seeking necessary healthcare.

224. These concerns, coupled with Defendants' actions and rhetoric regarding the 2026 elections, hamper AFT members' ability to conduct their voter education and voter engagement efforts across the country. AFT members fear that armed federal law enforcement officers may be inside or near the polling place when they arrive to vote or help a voter who has been turned away. Deployment of federal agents in the vicinity of voting locations would chill members' exercise of their fundamental right to vote, especially those who are naturalized citizens or members of immigrant communities.

225. Defendants' conduct has burdened AFT members' voting and voting-related activities. Many members are less likely to vote, volunteer at the polls, or assist other voters. AFT anticipates decreased voter turnout among AFT members for the midterm elections due to

Defendants' conduct and has, as a result, put considerable effort into recruiting volunteers and staff to bolster voter turnout efforts.

***Plaintiff UFCW***

226. UFCW believes in the American dream, the promise of our democracy, and the right of every citizen, whether U.S.-born or naturalized, to have their voice heard. But Defendants' intimidating conduct is hampering UFCW members' engagement in the 2026 midterm elections.

227. Many UFCW members work in retail industries, where surveillance related to immigration enforcement has become prevalent. Considering the rise in immigration operations at members' job sites, Defendants' elections-related rhetoric and conduct have caused UFCW members to fear that voting or otherwise engaging in the 2026 elections could subject them to further surveillance or investigation, putting not only themselves at risk, but their families and communities as well.

228. Defendants' coordinated attack on immigrant communities has caused UFCW's U.S. citizen members to fear that they will be confronted by federal agents in the vicinity of voting locations while attempting to exercise their right to vote, and be subject to arrest or other adverse consequences, including retaliation, physical harm, or negative legal action.

229. These credible fears are chilling UFCW members' willingness to exercise their right to vote and otherwise participate in the 2026 elections.

***Plaintiff IUPAT***

230. Defendants' conduct has caused fear among IUPAT's members. Many IUPAT members work in the trades—painting, drywalling, and other construction-related industries. Members have experienced a significant uptick of immigration enforcement operations at these types of job sites.

231. Considering Defendants' increased scrutiny of IUPAT members' workplaces, Defendants' actions and rhetoric related to the 2026 midterm elections have caused IUPAT members to fear that voting or otherwise engaging with elections could subject them to surveillance or investigation, putting not only themselves at risk, but also their families and communities.

232. IUPAT members are afraid that armed federal officers may be inside or near the polling place when they arrive to vote or help a voter who has been turned away. Deployment of federal agents to the vicinity of polling places during early voting or Election Day or at drop box sites in any jurisdiction in which members are registered to vote would chill members' exercise of their right to vote, especially those who are naturalized citizens or members of immigrant communities.

233. Defendants' conduct has burdened IUPAT members' voting and voting-related activities. Many members are less likely to vote, volunteer at the polls, or assist other voters. As a result of Defendants' conduct, IUPAT anticipates decreased voter turnout of its members for the 2026 midterm elections.

234. Defendants' conduct has forced Plaintiffs to bear the risk of harmful intimidation, surveillance, harassment, and physical violence by federal agents merely for choosing to vote, attempting to vote, or urging and aiding others to vote. The effect of Defendants' actions is to chill Plaintiffs' engagement in the 2026 electoral process, whether through casting ballots, serving as election workers, aiding family members with voting, or educating and turning out their neighbors to the polls. Defendants' infringement on Plaintiffs' exercise of the franchise violates federal law and must be enjoined.

## CLAIM FOR RELIEF

### COUNT I: Intimidation of Voters and Persons Urging or Aiding Voters
### Violation of Section 11(b) of the Voting Rights Act of 1965 (52 U.S.C. § 10307(b))

235. Plaintiffs incorporate the above paragraphs as if fully set forth herein.

236. Section 11(b) of the Voting Rights Act provides, in relevant part, "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote." 52 U.S.C. § 10307(b).

237. As set forth above, Defendants' conduct has an objectively intimidating effect on voters. Also as set forth above, Defendants' past and present actions indicate that they plan to engage in such conduct to attempt to intimidate, or that results in intimidation of, voters in connection with upcoming 2026 elections if they are not enjoined from doing so.

238. Defendants' past and present conduct also violates Section 11(b) because their actions involve conduct that "intimidate[s], threaten[s], or coerce[s], or attempt[s] to intimidate, threaten, or coerce" people involved in "aiding any person to vote or attempt to vote." *Id.* Under the Voting Rights Act, voting is specifically defined to include: "all action necessary to make a vote effective in any . . . election, including, but not limited to, registration, . . . other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election." 52 U.S.C. § 10310(c)(1). Defendants have attempted to intimidate and did intimidate Plaintiffs and their members, including those who seek to lawfully urge or aid eligible citizens with voting. Defendants' past and present

actions indicate that they are likely to engage in such conduct in connection with upcoming 2026 elections if they are not enjoined from doing so.

239. Plaintiffs are, or represent, people who are lawfully registered voters who intend to vote in the 2026 elections or are urging or aiding individuals to vote.

240. Defendants' conduct has caused Plaintiffs and their members to reasonably fear that they will encounter Defendants' agents and be subjected to intimidation, physical force, or wrongful detention or arrest when they vote or urge or aid people to vote, in violation of Section 11(b).

241. Defendants' conduct has caused Plaintiffs' members to reasonably fear that they will be subjected to harassment, surveillance, or retaliation when they vote or urge or aid people to vote, in violation of Section 11(b).

242. Defendants' conduct has caused Plaintiffs' members to reasonably fear that they will face legal repercussions when they vote or urge or aid people to vote, in violation of Section 11(b).

## PRAYER FOR RELIEF

To remedy these violations, Plaintiffs respectfully request that the Court:

(A) Declare that Defendants have engaged in conduct violating Section 11(b) of the Voting Rights Act;

(B) Enjoin Defendants, and anyone acting on behalf of Defendants or in concert with Defendants, from deploying agents in a manner that unlawfully intimidates voters or anyone urging or aiding voters;

(C) Award attorney's fees, costs, and expenses in accordance with law, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and

(D) Grant such other relief as this Court may deem just and proper.

DATED: September 18, 2026

Respectfully submitted,

Leah Wong*
Jane Shim*
Charles Jiang*
Patrick Stegemoeller*
Dinesh McCoy*
Niji Jain*
ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND
99 Hudson Street, 12th Floor
New York, NY 10013

/s/ Hayden Johnson
Hayden Johnson (DC Bar No. 1671830)
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Avenue NW #163
Washington, DC 20006
(202) 579-4582
Hayden.Johnson@protectdemocracy.org

Jessica A. Marsden*
PROTECT DEMOCRACY PROJECT
101 Glen Lennox, Suite 300
Chapel Hill, NC 27517

Benjamin R. Farley (DC Bar No. 90042585)
Imani Franklin (DC Bar No. 90006160)
NATIONAL IMMIGRATION LAW CENTER
PO Box 34573
Washington, DC 20043

John S. Cusick*
Brittany Carter*
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006

I. Sara Rohani** (DC Bar No. 1781155)
Hayley Hahn*** (DC Bar No. 90045921)
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
700 14th Street N.W., Ste. 600
Washington, DC 20005

Miranda Galindo*
Rex Chen*
LATINOJUSTICE PRLDEF
475 Riverside Drive, #1901
New York, NY 10115

Kristen M. Clarke (DC Bar No. 973885)
Anthony P. Ashton
Max L. Meyers*
NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE
4805 Mt. Hope Dr.
Baltimore, MD 21215

*Counsel for Plaintiffs NAACP, MFA, OCA, NUL, and MN8*

Jasleen K. Singh*
Patrick Berry*
BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271

Hayne Yoon*
BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW

Norman L. Eisen (DC Bar No. 435051)
Pooja Chaudhuri (DC Bar No. 888314523)
Sofia Fernandez Gold (DC Bar No. 90010196)
Harold Craig Becker (DC Bar No. 371239)
Tianna Mays (DC Bar No. 90005882)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003

*Counsel for Plaintiffs AFT, UFCW, and IUPAT*

777 6th St. NW, Suite 1100
Washington, DC 20001

*Counsel for Plaintiff SEIU*

* *Pro hac vice application forthcoming*
** *Admission to D.D.C. pending*
*** *Application for admission to D.D.C. forthcoming*